941 So.2d 973 (2005)
L.C.S.
v.
J.N.F.
J.N.F.
v.
A.S., C.S., and L.C.S.
No. 2030567 and 2031028.
Court of Civil Appeals of Alabama.
April 15, 2005.
Certiorari Denied May 26, 2006.
*974 John D. McCord of McCord & Martin, Gadsden, for appellant L.C.S.
Dani V. Bone, Gadsden, for appellee/cross-appellant J.N.F.
Leon Garmon, Gadsden, for appellees A.S., C.S., and L.C.S.
Alabama Supreme Court 1041137.
PITTMAN, Judge.
These two appeals involve a child, C.L.S. (hereinafter "the child"), who is currently *975 at the center of litigation involving L.C.S., the child's mother (hereinafter "the mother"); A.S. and C.S., the child's maternal grandparents, who have petitioned to adopt the child (hereinafter "the maternal grandparents"); and J.N.F., a man who has claimed to be the child's father. The parties have been before this court on one previous occasion. In J.N.F. v. A.S., 866 So.2d 582 (Ala.Civ.App. 2003) ("J.N.F. I"), this court considered the propriety of a judgment of the Etowah Probate Court ("the probate court") allowing the maternal grandparents to adopt the child despite J.N.F.'s unadjudicated objection to the proposed adoption. The main opinion in J.N.F. I sets forth much of the pertinent initial procedural history:
"In March 2002, the [maternal grandparents] filed their petition in the Etowah Probate Court, seeking to adopt the child; the petitioners identified the mother as being the only known person `from whom consents and relinquishments to th[e] adoption are required by law' and they alleged that the child had resided in their home since her birth. The mother gave written consent to the adoption of the child by the petitioners, and the probate court entered an order on March 26, 2002, awarding pendente lite custody of the child to the petitioners and setting a `dispositional hearing' for June 19, 2002. The probate court further directed that notice of the proceedings be served in the manner prescribed by § 26-10A-17, Ala.Code 1975, which provided, at the time of the probate court's order, that `notice of pendency of [an] adoption proceeding shall be served by the petitioner on,' among other persons, `[t]he father and putative father of the adoptee if made known by the mother or otherwise known by the court.' Section 26-10A-17(a)(10). Section 26-10A-17(c) provides for service `by publication, by posting, or by any other substituted service' upon a putative father `[i]f the identity or whereabouts of the parent is unknown, or if the one parent fails or refuses to disclose the identity or whereabouts of the other parent.'
"On April 10, 2002, the probate court directed that notice to `the unknown or undisclosed parent of [the child]' of the June 19, 2002, adoption proceedings be published at the expense of the petitioners. The notice of adoption was published for four consecutive weeks in a newspaper of general circulation in Etowah County; it was last published on May 8, 2002. On June 4, 2002, within 30 days of the final publication date of the notice of adoption, an attorney filed in the probate court a notice of his appearance on behalf of a man claiming to be the child's father, J.N.F. . . .; [J.N.F.] also filed an `objection' to the adoption, averring that he was a `fit and proper person' to have custody of the child and that DNA testing should be ordered to ascertain the child's paternity.
"The record does not reflect what transpired at the June 19, 2002, hearing on the adoption petition; however, the parties in the briefs to this court contend that the probate court gave them permission to file exhibits. On June 20, 2002, [J.N.F.] filed a number of documents in the probate court, including a calendar that, [J.N.F.] alleged, reflected the number of days the child had spent in [J.N.F.]'s home, a pediatric-clinic record signed by the mother identifying [J.N.F.] as the child's father, and documents indicating expenditures by [J.N.F.]'s family on behalf of the child for day care and medical care. On June 21, 2002, the petitioners filed copies of papers that, they alleged, concerned the circumstances of [J.N.F.]'s separation from military service. Finally, on June *976 25, 2002, [J.N.F.] submitted additional financial documents that he claimed showed day-care expenditures made by him on behalf of the child.
". . . In its judgment, the probate court stated, in pertinent part:
"`This above-styled cause is now properly before the Court for disposition; and it now appears that an Interlocutory Order has been entered in this matter . . .; that due and proper notice of these proceedings has been perfected on those entitled; that all required consents to the adoption have been placed of record; and that all other requisites of law have been met; and on motion the Court proceeds; and
"`The Court being satisfied from clear and convincing evidence adduced that the facts alleged in said petition are true; that the adoptee has been in the actual physical custody of the Petitioner(s) for a period of sixty (60) days or more; that there has been no contest or objections brought in this cause; that the Petitioner(s) is/are suitable to be the parent(s) of said adoptee and he/she/they desires to establish a parent/child relationship with the adoptee; that the best interest of the adoptee will be served by granting the petition; and that a change [of name of the adoptee and a change] of guardianship to the Petitioner(s) is proper.
"`It is therefore ORDERED, ADJUDGED AND DECREED by the Court that the Petition for leave to adopt . . . be and the same is hereby granted. . . . '"
866 So.2d at 582-84 (emphasis and footnotes omitted).
On appeal from that judgment, this court reversed. Although no single opinion garnered enough votes to amount to a majority opinion of this court, a reading of the three separate opinions offered by the judges voting to reverse the judgment indicates that the probate court's judgment was reversed because J.N.F. had filed a timely contest of the proposed adoption and, therefore, the contest should have been addressed by the probate court on its merits. See J.N.F. I, 866 So.2d at 584 (main opinion); 866 So.2d at 585 (Murdock, J., concurring in the result); 866 So.2d at 585 (Yates, P.J., concurring in the result in part and dissenting in part, joined by Crawley, J.).
On July 2, 2002, the day before filing a notice of appeal from the probate court's adoption judgment, J.N.F. filed a complaint in the Etowah Juvenile Court ("the juvenile court") seeking a determination that he was the father of the child and an award of custody as to the child.[1] Because J.N.F. I was pending before this court, the juvenile court stayed all proceedings until that appeal was decided.
Once J.N.F. I was decided, proceedings resumed in both courts. J.N.F. moved that the adoption proceedings be transferred to the juvenile court pursuant to Ala.Code 1975, § 26-10A-24(e); however, the probate court entered an order denying that motion, and this court denied, as untimely filed, a petition for a writ of mandamus challenging that order. Ex parte J.N.F. (No. 2020959, July 22, 2003), 891 So.2d 451 *977 (Ala.Civ.App. 2003) (table). Guardians ad litem were appointed by both courts to represent the interests of both the mother (who was a minor until July 2004) and the child. In July 2003, J.N.F. moved the probate court for a hearing in the adoption case, whereupon the maternal grandparents filed an objection in the probate court to further evidentiary hearings, arguing that J.N.F. had failed to register until July 1, 2002, with the Alabama Putative Father Registry, as established in Title 26, Chapter 10C, Ala.Code 1975, and that that omission barred his contest of the proposed adoption of the child. Without expressly acting on the maternal grandparents' motion, the probate court set a final hearing on the proposed adoption for October 7, 2003; however, that hearing was continued by the probate court because it had been scheduled on the same day that the juvenile court had directed deoxyribonucleic-acid (DNA) testing of the mother and the child. That scheduled DNA testing did not actually occur, however, until January 2004, at which time the probability of J.N.F.'s paternity of the child was determined to be 99.97%. By that time, the mother, acting through her guardian ad litem, had filed her own motion in the probate court for transfer of the adoption action to the juvenile court; however, that motion was not initially acted upon by the probate court.
In February 2004, the juvenile court held an ore tenus proceeding on J.N.F.'s paternity and custody action; at that time, an attorney purporting to represent the mother filed a motion to dismiss that action, contending that the juvenile court had no jurisdiction to act. The juvenile court entered a judgment on March 5, 2004, denying the motion to dismiss and declaring J.N.F. to be the father of the child; although the juvenile court denied J.N.F.'s custody request, J.N.F. was awarded visitation with the child and was directed to pay child support as to the child. The mother filed a postjudgment motion to alter, amend, or vacate that judgment; however, that motion was denied. The mother filed a timely notice of appeal from the juvenile court's judgment.
In July 2004, after the appeal had been taken from the juvenile court's judgment, J.N.F. filed in the probate court a motion to dismiss the adoption proceedings, alleging, in pertinent part, that the original adoption application had been defective and/or fraudulent in a number of respects; he also filed a response in support of the mother's earlier motion to transfer the adoption proceedings to the juvenile court. However, the mother, upon attaining the age of majority, appeared through counsel and withdrew the motion to transfer that her guardian ad litem had filed. The probate court then held an ore tenus proceeding on the maternal grandparents' adoption petition; after that proceeding, the mother filed a written consent to the proposed adoption. On July 30, 2004, the probate court entered a judgment granting the maternal grandparents' adoption petition; in that judgment, the probate court concluded, among other things, that J.N.F.'s consent to the adoption, which is required under Ala.Code 1975, § 26-10A-7, "may be implied by [his] actions and/or inactions . . . pursuant to Section 26-10A-9." J.N.F. timely appealed from that judgment, and this court granted his motions to stay that judgment pending further orders of this court and to incorporate the appellate record from J.N.F. I into the record in the appeal from the probate court's judgment of adoption.
Ala.Code 1975, § 12-15-120(a), provides that an appeal to a circuit court from a judgment of a juvenile court may be taken within 14 days of the entry of the juvenile court's judgment and that appeals "under this chapter" are to "take precedence over *978 all other business of the court to which the appeal is taken." Although this court has held that that statute was superseded by the promulgation of Rule 28, Ala. R. Juv. P. (Wright v. Montgomery County Dep't of Pensions & Sec., 423 So.2d 256, 257 (Ala. Civ.App. 1982)), and although that statute does not expressly address direct appeals to this court (compare Ala.Code 1975, § 26-10A-26(b), pertaining to adoption appeals), this court has, nonetheless, sought to dispose of appeals from juvenile-court judgments with dispatch, given the importance of family-law questions generally presented by the parties to such appeals. See Rule 28, Ala. R. Juv. P., Comment to Amendment Effective November 15, 1985. However, we have departed from our usual practice and have deferred our consideration of the appeal from the juvenile court's judgment of paternity until the submission of the appeal from the probate court's judgment allowing the proposed adoption. Indeed, as will be discussed below, our resolution of the appeal from the probate court's judgment of adoption directly affects our disposition of the appeal from the juvenile court's paternity judgment, and we have therefore elected to treat both appeals in the same opinion.
J.N.F. argues that the probate court did not have the power to determine whether the adoption should be allowed during the pendency of the appeal from the juvenile court's judgment of paternity. We disagree; we perceive no legal impediment to the probate court's exercise of its statutory jurisdiction to determine whether a man may be deemed to have consented to an adoption petition simply because a dispute exists concerning the validity of another court's judgment declaring that that man is, in fact, the father of the proposed adoptee. The probate court's power to grant an adoption under the AAC is expressly conditioned upon the existence of the consent of the appropriate parties. The probate court's jurisdiction over the adoption petition was thus correlative of, not in conflict with, the juvenile court's jurisdiction to declare J.N.F. to be the child's biological father. Cf. Ex parte C.L.C., 897 So.2d 234, 237 (Ala. 2004) (holding that a probate court retained "exclusive jurisdiction over the issue of whether or not to grant or deny [a] petition to adopt" a child notwithstanding the juvenile court's jurisdiction to terminate parental rights of child's father).
We next address whether, as J.N.F. argues, the probate court could not grant the maternal grandparents' petition because, he says, the petition was "a fraud upon the Probate Court" in that the child's father's identity and location were falsely alleged by the maternal grandparents to be unknown. J.N.F.'s argument overlooks the decision of this court in J.N.F. I, which occurred after the filing of the original petition for adoption in this cause; we reversed the probate court's original judgment and directed that court, on remand, to consider J.N.F.'s contest of the adoption in deciding whether to grant the maternal grandparents' adoption petition. In effect, J.N.F. I held that the probate court could, and should, consider whether the requested adoption should take place despite any misstatements appearing in the maternal grandparents' petition. The failure of the maternal grandparents to file an amended adoption petition after this court's remand in J.N.F. I or after the probate court's ore tenus proceeding does not affect the power of the probate court to award the maternal grandparents the relief to which the probate court deemed them to be entitled under the evidence. See Rules 15(b) and 54(c), Ala. R. Civ.P.[2]
*979 Finally, we address whether the probate court's judgment granting the maternal grandparents' petition on the basis of J.N.F.'s having given implied consent to the adoption is unsupported by the evidence, as J.N.F. contends. As we have stated, the probate court determined that J.N.F.'s consent to the adoption could be implied pursuant to Ala.Code 1975, § 26-10A-9, which states the conditions upon which a consent to an adoption may be implied. In support of his argument, J.N.F. quotes the version of § 26-10A-9(a) that was in effect from 1999 through April 2002 and that listed the following four acts as bases for implied consent:
"(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
"(2) Leaving the adoptee without provision for his or her identification for a period of 30 days.
"(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
"(4) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days."
However, as the main opinion and Judge Thompson's dissenting opinion in J.N.F. I noted, the Legislature enacted Act No. 2002-417 in April 2002, while this case was pending, which added "[f]ailing to comply with Section 26-10C-1" as a fifth basis upon which a parent's implied consent to an adoption may be predicated. Section 26-10C-1, Ala.Code 1975, in turn, provides for registration of unmarried fathers of children with the Alabama Putative Father Registry as a prerequisite to claiming parental rights. Moreover, Act No. 2002-417 added a second subsection to § 26-10A-9 under which implied consent to an adoption "may not be withdrawn by any person."
It is undisputed that J.N.F. did not comply with § 26-10C-1. That section provides that a person filing a notice of intent to claim paternity of a child shall file a form with the State Department of Human Resources that includes various items of information, including the claimant's name, Social Security number, date of birth, and current address; similar information regarding the mother (if known); the claimant's income and financial information; the child's name and place of birth (if known); and the possible dates of sexual intercourse. Ala.Code 1975, § 26-10C-1(c). Since 1999, § 26-10C-1(i) has provided that any person claiming to be the biological father of a child who fails to file a proper notice of intent to claim paternity with the Registry within 30 days of the birth of any child out of wedlock "shall be deemed to have given an irrevocable implied consent in any adoption proceeding." The child in this case was born on June 10, 2001; however, J.N.F. did not file a notice of intent to claim paternity with the Putative Father Registry within the 30-day period specified in § 26-10C-1(i).[3]
*980 Under Ala.Code 1975, § 26-10A-9(a)(5), § 26-10A-9(b), and § 26-10C-1(i), the effect of J.N.F.'s failure to file a notice of intent to claim paternity in compliance with Ala.Code 1975, § 26-10C-1, is clear: J.N.F. may properly be deemed to have given an irrevocable implied consent to the adoption of the child. The Legislature's intent, expressed in Section 3 of Act No. 2002-417, that its amendments to §§ 26-10A-9 and 26-10C-1 be applied retroactively to January 1, 1997, indicates that the outcome reached by the probate court in this case is precisely that which the Legislature intended.
Interestingly, although the main opinion in J.N.F. I alluded to potential constitutional concerns regarding the retroactive application of Act No. 2002-417 in pending adoption litigation (while indicating that such concerns should be addressed by the probate court in the first instance), see 866 So.2d at 585, J.N.F. has not contended, at trial or on appeal, that the retroactive application of Act No. 2002-417 violates the United States or Alabama Constitutions in any manner. It is well settled that in the absence of a valid constitutional challenge, the judicial branch is bound to enforce the will of the Legislature. As the Supreme Court stated in Beasley v. Bozeman, 294 Ala. 288, 290, 315 So.2d 570, 571 (1975), "[t]he Legislature's power should not be interfered with unless it is exercised in a manner which plainly conflicts with some higher law."
In this case, the probate court's conclusion that J.N.F. impliedly consented to the adoption of the child is amply supported by the record and by the law of this state.[4] In addition, evidence presented at trial concerning the living arrangements of the maternal grandparents, J.N.F.'s checkered military career and labor history, and the mental and learning disorders from which J.N.F. apparently suffers supports the probate court's determination that permitting the maternal grandparents to adopt the child would serve the child's best interests. We thus conclude that the judgment of the probate court permitting the maternal grandparents to adopt the child is due to be affirmed.
Our conclusion regarding the appeal from the probate court's judgment allowing the adoption directly affects the viability of the mother's appeal from the juvenile court's judgment of paternity. As we stated in Young's Realty, Inc. v. Brabham, 896 So.2d 581, 583 (Ala.Civ.App. 2004):
"`"The general rule is that an appeal is subject to dismissal if, pending the appeal, an event occurs which makes a determination of the appeal unnecessary."' Board of Adjustment of Montgomery v. Priester, 347 So.2d 530, 531 (Ala.Civ.App. 1977) (quoting Moore v. Cooke, 264 Ala. 97, 100, 84 So.2d 748, 749-50 (1956)). One such event is an elimination of a justiciable controversy between the parties pending appeal. See Water Works & Sewer Bd. of Birmingham v. Petitioners Alliance, 824 So.2d 705, 708 (Ala. 2001) (dismissing appeal from action seeking declaratory relief on the basis that `a present controversy between any of the parties' did not exist)."
During the pendency of the mother's appeal from the juvenile court's judgment declaring J.N.F.'s paternity, she gave unconditional *981 consent to the adoption of the child by the maternal grandparents, and the probate court acted on that consent by entering a judgment permitting the child to be adopted by the maternal grandparents. Under Ala.Code 1975, § 26-10A-29(b), a portion of the AAC, after a final judgment of adoption has been entered, the natural parents of the adoptee are thereafter "relieved of all parental responsibility for the adoptee and will have no parental rights over the adoptee" (emphasis added). Because the probate court, after the juvenile court entered its paternity judgment in favor of J.N.F. as to the child, permitted the maternal grandparents to adopt the child, and because we have concluded that the probate court correctly entered that judgment, the mother's appeal from the juvenile court's judgment of paternity is moot as a matter of law even if this court were to reverse the juvenile court's judgment, the mother would in no event be legally entitled to any greater parental role in the life of the child. Because the appeal from the juvenile court's judgment is moot, we dismiss that appeal.
2030567APPEAL DISMISSED.
BRYAN, J., concurs.
THOMPSON, J., concurs in the result, without writing.
MURDOCK, J., concurs in the result, with writing, which CRAWLEY, P.J., joins.
2031028AFFIRMED.
CRAWLEY, P.J., and MURDOCK and BRYAN, JJ., concur.
THOMPSON, J., concurs in the result, without writing.
MURDOCK, Judge, concurring in the result as to case number 2030567 and concurring as to case number 2031028.
I agree with the main opinion that our affirmance of the judgment of adoption of the probate court in case number 2031028 makes the separate appeal from the juvenile court's judgment of paternity moot. I disagree as to the reason this is so, however.
Insofar as the appeal of the paternity judgment is concerned, the relief requested would amount to an adjudication by this court that would deprive the father of any parental rights to the child. The appeal seeking that adjudication is moot, not because the party prosecuting that appeal has lost her own parental rights,[5] but because such an adjudication has already been achieved in a separate proceeding; the father cannot be deprived by virtue of the appeal of the paternity judgment of any parental rights of which he has not already been deprived by virtue of our affirmance of the judgment in the adoption case.
NOTES
[1] The caption of that action (In re: C.S.) did not bear an adversarial style, and because the maternal grandparents were served with process in the action (apparently because of the mother's minority), they initially attempted to appear and to file motions in the case; however, the juvenile court later ruled that the maternal grandparents were not parties to the paternity action and ordered all papers filed by the maternal grandparents struck from the case file.
[2] If neither the AAC nor statutes specifically applicable to probate courts speak to a particular procedural issue, the procedures applicable in circuit courts apply to adoption proceedings in the probate courts. See Ala.Code 1975, § 12-13-12; In re Morrison, 388 So.2d 1014, 1015 (Ala.Civ.App. 1980); and Ex parte Hicks, 451 So.2d 324, 326 (Ala.Civ.App. 1984).
[3] Although J.N.F. testified in the probate court that he had filed with the Putative Father Registry during the month of April after the child's birth, the record in the appeal from the juvenile court's judgment contains a document purporting to be a form mailed to the Registry on July 2, 2002.
[4] We need not reach the maternal grandparents' alternative contention that J.N.F. "abandoned" the child by unilaterally enlisting in the armed services after the birth of the child.
[5] I am concerned that the main opinion's focus upon the mother's loss of parental rights has the effect of a holding that a mother who has lost her parental rights has no standing to contest the father's parental status. The correctness of such a result might be argued (the ability of a party to contest a father's paternity action or to seek the termination of a parent's parental rights is not dependent on that party's status as a parent of the child), and the mootness of the appeal of the paternity judgment does not, in my opinion, turn on this issue.